**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**
**MANHATTAN DIVISION**

| | | |
|---|---|---|
| **ACTIVEHOURS, INC. D/B/A EARNIN**<br><br>Plaintiff,<br><br>**v.**<br><br>**Hillary Fajardo, an individual, Steven Aviles, an individual, Lenny Lorenzi, an individual, Emily Jerez, an individual, Donald Boakye, an individual.**<br><br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **Case No. 1:26-cv-07193** |

## COMPLAINT

Plaintiff Activehours, Inc. d/b/a EarnIn ("EarnIn"), by and through its counsel, seeks declaratory relief concerning which Terms of Service govern the relationship with a subset of customers who improperly submitted arbitral demands to an incorrect forum, and alleges the following for its Complaint against Defendants Hillary Fajardo, Steven Aviles, Lenny Lorenzi, Emily Jerez, and Donald Boakye (collectively, "Defendants"):

## INTRODUCTION

1. EarnIn has Terms of Service ("Terms") that govern the relationship with its customers, including Defendants. EarnIn's Terms include an arbitration agreement. As part of EarnIn's business practices, it regularly updates its Terms. On September 15, 2025, EarnIn updated its Terms (the "Current Terms") to change the arbitral forum for resolving disputes with its customers from the American Arbitration Association ("AAA") to National Arbitration and Mediation ("NAM"). Defendants all accepted the Current Terms.

2. EarnIn brings this Complaint because Defendants' purported counsel, Labaton Keller Sucharow LLP and Berger Montague PC (collectively "Labaton"), initiated a mass arbitration against EarnIn and filed arbitration demands on Defendants' behalf in the wrong arbitral forum.

3. Beyond these five Defendants, Labaton also filed arbitration demands on behalf of 9,521 additional individuals with the AAA against EarnIn (together, the "Mass Arbitration Claimants"). Labaton contends that it represents a total of 35,096 individuals with purported claims against EarnIn (the "Labaton Claimant Pool").

4. Counsel for claimants in a mass arbitration often seek to pressure the target company through the threat of arbitration fees rather than the substantive merit of the underlying threatened claims. With little to no screening to determine whether any individual has a viable claim against the target company, the firm will gather thousands of individuals solicited through social media advertising and taken through a streamlined "client engagement" process that is nothing more than a simple online questionnaire that takes no more than a few minutes to fill out, with little vetting to follow. Thereafter, the firm designates the individuals as "clients" with alleged claims against the target company. Typically, firms initiating mass arbitrations fail to perform due diligence on their purported clients. The solicitation and intake process are so haphazard that many purported clients end up registering for multiple, concurrent mass arbitrations involving the exact same claims, and many do not have viable claims against the target company at all.

5. In soliciting for Labaton's mass arbitration against EarnIn, Labaton's website attracted individuals with the following:




6. On information and belief, if an individual clicked the "Get Started" link in Labaton's solicitation, they were then asked: (i) whether they had an EarnIn account; (ii) whether they had received a cash advance from EarnIn; (iii) whether they were 18 years of age or older; and (iv) whether they had filed or intended to file for bankruptcy in the next year. After answering those simple questions in "less than 2 minutes", an individual could become part of the Labaton Claimant Pool.

7. State regulators and attorneys general have recently voiced concerns about these practices, noting the potential for abuse by claimants' counsel and acknowledging the fact that many "clients" are not even aware they are being represented, are deceased, are already represented by a different firm in a separate proceeding, or have no underlying claim. *See* "Carr Sends Warning to Arbitration Organizations Accused of Abusive Practices," Georgia Office of the Attorney General (December 8, 2025) https://law.georgia.gov/press-releases/2025-12-08/carr-sends-warning-arbitration-organizations-accused-abusive-practices.

8. EarnIn is a leading provider of Earned Wage Access ("EWA"), which allows EarnIn customers to access a portion of their earned, but unpaid, wages before their scheduled payday, with no mandatory fees, no interest, and no legal obligation for consumers to repay it.

9. Millions of Americans face difficulties paying their bills because of an absence of liquidity between paychecks. The standard American pay cycle forces workers to accrue wages for fourteen days, or in the case of monthly-paid employees, up to thirty-one days, before receiving compensation for labor already performed.

10. During this period, the wages legally owed to these workers remain inaccessible, locked within payroll systems that operate on schedules designed for administrative convenience rather than employees' needs. In effect, workers give employers a no-interest loan for these earned wages. The result is a persistent and structural liquidity gap that leaves working Americans without the cash necessary to meet their financial obligations, even though they have already earned the money to cover them.

11. Unexpected or poorly timed bills can place extraordinary financial pressure on workers who lack readily available funds between paydays. A sudden car repair, an unanticipated medical expense, or a utility bill that becomes due arrives before the next paycheck can transform a routine financial challenge into an acute crisis.

12. Historically, workers facing these shortfalls have had few viable options: costly bank overdraft programs, expensive revolving credit card debt, or predatory payday loans. Each of these alternatives exacts a punitive cost from the workers who can least afford to bear it.

13. EarnIn's direct-to-consumer EWA product "Cash Out" is different. Standard Cash Out transactions are entirely free and usually arrive the next business day. The only two potential costs associated with Cash Out are entirely optional: (1) customers can choose to expedite a

payment of their earned but unpaid wages to their linked debit card via an instant cash transfer service called "Lightning Speed" for a non-recurring flat fee; and (2) customers can leave an optional tip in appreciation for the service. It is available to customers to help cover rent, utilities, unexpected bills, gas purchases, or groceries in times of end-of-pay-cycle shortfalls or unanticipated financial needs. Through EarnIn's Cash Out product, customers can smooth income timing gaps, pay down debt, build savings or invest, obtain necessary goods and services, deal with small, emergency expenses on their preferred timeline, and avoid high-priced alternatives like payday loans, traditional credit cards, late fees, and overdraft fees.

14. Consumers find immense value in EarnIn's service, which is not surprising given an EarnIn survey of 1,654 customers, conducted between October 12, 2023 and November 15, 2023, showed that its customers save about $756 per year on average by avoiding late fees. In that same study, approximately 82% of EarnIn customers reported feeling less stressed about their financial situation, and three out of five customers paid bills on time more often. And in a survey of 1,630 EarnIn customers, conducted between November 14, 2025 and December 17, 2025, roughly 45% of those customers reported that since using EarnIn's services, they could afford a $400 emergency when previously they could not.

15. Despite these clear benefits of the Cash Out product to consumers, Labaton threatened EarnIn with a mass arbitration on behalf of the 35,096 individuals in the Labaton Claimant Pool with ***identical***, unmeritorious claims for alleged violations of the Truth in Lending Act ("TILA"), state usury laws, and state lending licensing laws. Labaton's core theory is that consumers must not understand the nature of the products and have been duped into incurring Lightning Speed fees and providing tips.

16. On information and belief, Labaton's mass arbitration campaign was not designed to litigate the Labaton Claimant Pool's claims on the merits. Instead, its goal was to leverage the threat of millions of dollars in arbitration filing fees EarnIn would owe before any claim could be adjudicated.

17. Nonetheless, EarnIn agreed to mediate with Labaton in an attempt to resolve the Labaton Claimant Pool's disputes.

18. As part of a pre-mediation data exchange, EarnIn collected transaction data on the 35,096 individuals within the Labaton Claimant Pool and determined that almost 10,000 could not be verified as an EarnIn customer with a transaction between August 8, 2023 and August 8, 2025. EarnIn also determined that more than half of the verified customers within the Labaton Claimant Pool agreed to the Current Terms and are therefore required to arbitrate any disputes with NAM pursuant to Earnin's Current Terms. EarnIn shared this data with Labaton.

19. Mediation failed.

20. Thereafter, on June 17, 2026, Labaton filed demands with AAA on behalf of 5,211 of the Mass Arbitration Claimants. On August 3, 2026, Labaton filed demands with AAA on behalf of an additional 4,315 of the Mass Arbitration Claimants. Of the Mass Arbitration Claimants, EarnIn has been unable to verify roughly 14 percent of them as actual EarnIn customers during the relevant time period. EarnIn also confirmed that nearly 5,000 of the Mass Arbitration Claimants (approximately 60 percent of the Mass Arbitration Claimants EarnIn could verify as customers) performed at least one Cash Out transaction after September 15, 2025, and are therefore required to arbitrate any disputes with NAM (the "NAM Claimants").

21. Due to the data exchange, Labaton knew that vast swaths of the Labaton Claimant Pool could not be confirmed as EarnIn customers during the relevant time period, lacked viable

claims, or were contractually obligated to arbitrate their dispute with NAM. Despite this knowledge, in filing the Mass Arbitration Claimants' demands with AAA, Labaton refused to vet which of the individuals within the Labaton Claimant Pool were EarnIn customers with viable claims and which were required to arbitrate disputes with NAM.

22. EarnIn brings this complaint seeking a declaratory judgment that: (1) the Current Terms are valid and enforceable as to each Defendant; (2) each Defendant is bound by the Current Terms; and (3) each Defendant must pursue their claims in individual arbitration with NAM.

## PARTIES

23. EarnIn, a financial technology company domiciled in Mountain View, California, is a leader in the EWA industry.

24. Hillary Fajardo is an individual purportedly represented by Labaton in an arbitration pending before the AAA who resides in Bronx County, New York.

25. Steven Aviles is an individual purportedly represented by Labaton in an arbitration pending before the AAA who resides in New York County, New York.

26. Emily Jerez is an individual purportedly represented by Labaton in an arbitration pending before the AAA who resides in New York County, New York.

27. Lenny Lorenzi is an individual purportedly represented by Labaton in an arbitration pending before the AAA who resides in New York County, New York.

28. Donald Boakye is an individual purportedly represented by Labaton in an arbitration pending before the AAA who resides in Rockland County, New York.

29. The Defendants are a subset of NAM Claimants purportedly represented by Labaton with an individual arbitration demand filed with the AAA.

## JURISDICTION AND VENUE

30. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 2201 because the underlying controversy involves claims arising under the laws of the United States.

31. When a case or controversy is within a court's jurisdiction, a federal court "may declare the rights and other legal relations of any interested party seeking such a declaration." *See* 28 U.S.C. § 2201.

32. The Court can exert personal jurisdiction over Defendants because each of them resides in this judicial district.

33. Venue is proper in this Court because Defendants are domiciled in New York, and on information and belief, accepted the Current Terms with EarnIn in New York, and transacted with EarnIn in New York.

## FACTUAL ALLEGATIONS

### A. EarnIn Provides Valuable Support for Customers Who Need Access to Their Already Earned But Unpaid Wages.

34. Through its direct-to-consumer EWA product—Cash Out—EarnIn allows workers to access a portion of wages they have already earned, but have not yet received, before payday. Customers use Cash Out as a short-term liquidity bridge tied to work they have already completed and for which they have yet to be paid.

35. Customers use Cash Out primarily to avoid timing mismatches between expenses and paychecks, reduce financial stress, and maintain control and dignity over their finances without taking on traditional debt or incurring interest. Said another way, customers use Cash Out to access money they have already earned in moments when life does not wait for payday—so they can cover necessities, avoid debt, and stay in control without stress or shame. Customers typically use Cash Out to cover rent, utilities, unexpected bills, gas purchases, or groceries during end-of-pay-

cycle shortfalls or unanticipated financial needs. They use it to avoid late fees, overdraft fees, payday loans, credit card debt, and other more expensive forms of liquidity.

36. Cash Out involves no legal obligation to repay, no interest, no late fees, no mandatory fees, no recourse, no credit impact, and none of the other hallmarks or key characteristics of either credit or a loan.

37. Standard Cash Out transactions are entirely free and usually arrive the next business day via the Automated Clearinghouse ("ACH").

38. The only two potential costs associated with Cash Out are entirely optional. First, customers can choose to expedite a payment of their earned but unpaid wages to their linked debit card via an instant transfer service called "Lightning Speed" for a non-recurring flat fee of between $2.99 and $5.99. Second, customers can leave an optional tip in appreciation for the service. Tipping is completely voluntary.

39. Customers must affirmatively authorize each Cash Out and can terminate their EarnIn account—and revoke their debit authorization—confirming there is no obligation to repay. When customers exercise this right, EarnIn has no legal right to compel repayment and does not pursue collection activity.

**B. EarnIn's Relationship with Customers is Governed by its Terms of Service, and the Current Terms Require Arbitration with NAM.**

40. The relationship between EarnIn and its customers is governed by EarnIn's Terms. EarnIn's Terms require arbitration.

41. The Current Terms became effective on September 15, 2025.[1]

[1] EarnIn updated the Terms on March 11, 2026 to make slight changes to the list of EarnIn's subsidiaries and affiliates and made no revisions to the "Dispute Resolution by Binding Arbitration" from the Current Terms. On May 7, 2026, EarnIn again made slight changes to modify the "Notice to California Customers" regarding EarnIn's licensing in California. No revisions were made to the "Dispute Resolution by Binding Arbitration."

42. The Current Terms require that any "Dispute" be heard in arbitration. Dispute is defined to include any claim arising out of or related to EarnIn's services, any communications between a customer and EarnIn, or the scope, enforceability, or validity of the arbitration provision contained in the Current Terms.

43. The Current Terms include an arbitration provision requiring that all disputes be arbitrated with NAM[2]:

> Arbitration will be administered by National Arbitration & Mediation ("NAM") following the NAM Comprehensive Dispute Resolution Rules and Procedures (the "NAM Comprehensive Rules") in effect at the time of the arbitration. The NAM Comprehensive Rules shall be supplemented, where applicable, by the NAM Mass Filing Supplemental Dispute Resolution Rules and Procedures (the "NAM Mass Filing Rules" and, together with the NAM Comprehensive Rules, the "NAM Rules"), or modified by this Dispute Resolution Agreement.

44. The Current Terms contain an opt out provision that permits customers to opt out from the arbitration agreement contained in the Current Terms "within 30 days after first becoming subject" to the agreement by sending an opt-out notice to legal-notices@earnin.com or by regular mail to EarnIn. The opt-out notice must include the customer's name, address, email address, and signature. The opt-out notice must also be sent *individually*, and notices submitted by third parties are not effective.

45. The Current Terms also contain an Informal Dispute Resolution provision that claimants must satisfy before filing a demand in arbitration. None of the Defendants, and none of the Mass Arbitration Claimants, complied with those provisions before filing their demands with AAA.[3]

---

[2] Previous versions of the Terms required arbitration with AAA (collectively, the "Prior Terms").

[3] The Prior Terms also contain informal dispute resolution requirements (that differ from the provisions of the Current Terms) prior to filing a demand in arbitration. None of the Defendants and none of the individuals within the Labaton Claimant Pool complied with the Prior Terms' informal dispute resolution requirements prior to filing their demands with AAA.

46. Customers received notice of the Current Terms via multiple methods and assented to the Current Terms by continuing to use EarnIn's product after the Current Terms went into effect.

47. First, a clearly labeled email with a conspicuous subject line of "Update: EarnIn's Terms of Service and Privacy Policy" was sent to all EarnIn customers on September 15, 2025 (the "Email Notice"). The Email Notice can be seen below.

> earn in
>
> Hi Community Member,
>
> We've updated our General Terms of Service, and Privacy Policy, effective September 15, 2025. Please review them carefully. You can also find important information summarizing some of the changes in this email.
>
> **Here's some of what's changing:**
>
> - **Arbitration**: We introduced a more structured informal dispute process, changed our arbitration provider, added procedures to make arbitration more efficient, modified the opt-out provision, and made other updates to the arbitration agreement. .
> - **Privacy Policy**: We've updated our Privacy Policy to reflect how personal information may be used in connection with new services, including our payroll platform.
>
> By continuing to use EarnIn after September 15, 2025, you are agreeing to the updated terms, including the arbitration agreement in the General Terms of Service. If you do not agree to the updated General Terms of Service or Privacy Policy, you must stop using EarnIn's services.
>
> Thank you for being a valued part of the EarnIn Community.
>
> -Team EarnIn

48. The Email Notice reiterated that the message was from EarnIn as EarnIn's recognizable logo was displayed at the top. The length of the email was manageable for a reasonable consumer as it only contained eight sentences written in plain English.

49. The first sentence of the Email Notice contained a conspicuous hyperlink for

customers to view the Current Terms with one click. That sentence also clearly stated that the Current Terms would become effective on September 15, 2025.

50. EarnIn provided just two bullet points highlighting the relevant changes. The first bullet started with a bolded "**Arbitration**" and let the customer know that, among other changes, the arbitration provider had been changed.

51. The second to last paragraph of the Email Notice put customers on notice that continued use of EarnIn after September 15, 2025 would constitute acceptance of the Current Terms.

52. In addition to the succinct and effective email, EarnIn notified its customers of the Current Terms via a notification in their EarnIn application (the "App").

53. The App notification asked customers to review the updates, provided streamlined instructions on how to inspect the Current Terms, and overtly stated that continued use of EarnIn after September 15, 2025 would constitute acceptance of the Current Terms.

54. Lastly, each time a customer completed a Cash Out transaction, they received notice of the Current Terms via hyperlink *both* when they selected the desired transfer speed for their funds *and* at confirmation of their Cash Out.

55. Accordingly, by continuing to use EarnIn's services after September 15, 2025, Defendants accepted the provisions contained within the Current Terms, including the arbitration agreement, as did any other customers who chose to use EarnIn's services after being notified.

## C. Defendants are EarnIn Customers Who Consistently Utilized EarnIn's Cash Out Product and Agreed to the Current Terms.

***Hillary Fajardo***

56. Hillary Fajardo is a Cash Out user. Fajardo received the Email Notice on September 15, 2025. EarnIn also sent Fajardo a notification of the Current Terms within the EarnIn App.

57. Fajardo has executed approximately twenty-six Cash Out transactions, with most transactions occurring after September 15, 2025. Fajardo never paid a tip on a Cash Out transaction.[4] Fajardo executed her first Cash Out transaction after she received the Email Notice on October 15, 2025. For each of the transactions occurring after September 15, 2025, Fajardo received notice of the Current Terms via hyperlink when she selected the desired transfer speed for her funds, and at confirmation of her Cash Out.

***Steven Aviles***

58. Steven Aviles is a Cash Out user. Aviles received the Email Notice on September 15, 2025. EarnIn also sent Aviles a notification of the Current Terms within the EarnIn App.

59. Aviles has executed hundreds of Cash Out transactions, including approximately 153 transactions after September 15, 2025. He has never paid a tip on a Cash Out transaction and has paid a Lightning Speed fee on less than 20 percent of his Cash Out transactions. Aviles executed his first Cash Out transaction after he received the Email Notice on September 16, 2025. For each of the transactions occurring after September 15, 2025, Aviles received notice of the Current Terms via hyperlink when he selected the desired transfer speed for his funds, and at confirmation of his Cash Out.

***Emily Jerez***

60. Emily Jerez is a Cash Out user. Jerez received the Email Notice on September 15, 2025. EarnIn also sent Jerez a notification of the Current Terms within the EarnIn App.

61. Jerez has executed more than 200 Cash Out transactions, including at least 66 transactions after September 15, 2025. She paid a Lightning Speed fee on 27% of all her Cash Out transactions, and a tip on 63% of her transactions. Jerez executed her first Cash Out transaction

---

[4] Defendant data referenced herein is current as of June 29, 2026.

after she received the Email Notice on September 18, 2025. For each of the transactions occurring after September 15, 2025, Jerez received notice of the Current Terms via hyperlink when she selected the desired transfer speed for her funds, and at confirmation of her Cash Out.

***Lenny Lorenzi***

62. Lenny Lorenzi is a Cash Out user. Lorenzi received the Email Notice on September 15, 2025. EarnIn also sent Lorenzi a notification of the Current Terms within the EarnIn App.

63. Lorenzi has executed more than 350 Cash Out transactions, including approximately 156 transactions after September 15, 2025. He only paid a Lightning Speed fee on 0.28% of all his Cash Out transactions, and a tip on 1.42% of all his Cash Out transactions. Lorenzi executed his first Cash Out transaction after he received the Email Notice on September 16, 2025. For each of the transactions occurring after September 15, 2025, Lorenzi received notice of the Current Terms via hyperlink when he selected the desired transfer speed for his funds, and at confirmation of his Cash Out.

***Donald Boakye***

64. Donald Boakye is a Cash Out user. Boakye received the Email Notice on September 15, 2025. EarnIn also sent Boakye a notification of the Current Terms within the EarnIn App.

65. Boakye has executed more than 100 Cash Out transactions, including approximately 38 transactions after September 15, 2025. He paid a Lightning Speed fee on just one of his transactions, and he has never tipped on a Cash Out transaction. Boakye executed his first Cash Out transaction after he received the Email Notice on September 24, 2025. For each of the transactions occurring after September 15, 2025, Boakye received notice of the Current Terms via hyperlink when he selected the desired transfer speed for his funds, and at confirmation of his Cash Out.

### D. Labaton Threatens Claims on Behalf of the Labaton Claimant Pool Based on Vague Factual Allegations.

66. On information and belief, Labaton gathered the Labaton Claimant Pool through social media advertising and on its solicitation website. Thereafter, on information and belief, the individuals within the Labaton Claimant Pool went through a streamlined online questionnaire process with little to no screening by Labaton to determine whether the individual provided accurate information, ever actually performed any Cash Out transactions or paid any fees or tips to EarnIn, has a viable claim, and fully understood the nature of the claim or even realized the type of representation they signed up for.

67. On August 8, 2025, Labaton sent EarnIn a demand letter on behalf of 12,241 individuals, claiming that EarnIn violated (1) TILA, (2) state usury statutes, and (3) state lending license laws. On October 13, 2025, Labaton provided EarnIn with an expanded list of 32,795 individuals who were part of the Labaton Claimant Pool purporting to bring the exact same claims against EarnIn.

68. On February 5, 2026, EarnIn provided Labaton with anonymized data for the individuals within the Labaton Claimant Pool who had transactions with EarnIn between August 8, 2023 and August 8, 2025. The data exchange confirmed that vast swaths of the Labaton Claimant Pool lack any viable claim against EarnIn.

69. Indeed, out of the 32,795 individuals within the Labaton Claimant Pool whose information was provided to EarnIn, EarnIn could not verify over 7,500 as an EarnIn customer with a Cash Out transaction during the relevant time period, demonstrating both that Labaton's solicitation methods resulted in thousands of potential non-customers signing up for a mass arbitration against a company they have no relationship with, and suggesting that Labaton failed to perform even a modicum of diligence into whether the individuals within the Labaton Claimant

Pool had cognizable claims against EarnIn.[5]

**E. Labaton Improperly Files Individual Arbitration Demands with AAA on Behalf of Defendants and Other Mass Arbitration Claimants Who Agreed to NAM as their Arbitral Forum.**

70. Despite the issues with the Labaton Claimant Pool's alleged claims, on March 11, 2026, EarnIn engaged in mediation with Labaton. The mediation was unsuccessful.

71. On March 12, 2026, Labaton purported to opt out all of the Labaton Claimant Pool from EarnIn's Terms of Service dating back to August 2025 (the "March 12 Letter"). The purported mass opt-out in the March 12 Letter, however, was improper and ineffective. As set forth above, *see supra* ¶ 44, the Current Terms require that any opt-out notice be submitted individually by the customer, include that customer's signature, and be sent within 30 days of first becoming subject to the Current Terms; the March 12 Letter did not satisfy these requirements, as it was submitted by Labaton—a third party—on behalf of 35,096 individuals without their individual signatures.

72. On March 26, 2026, EarnIn responded to the March 12 Letter (the "March 26 Letter"). The March 26 Letter explicitly informed Labaton that many of the individuals within the Labaton Claimant Pool would be required to arbitrate with NAM, and that improperly initiating arbitration with AAA for such individuals would expose Labaton and their purported clients to potential sanctions. EarnIn also explained that, regardless, no individual within the Labaton Claimant Pool had yet completed the pre-dispute resolution processes required in both the Current Terms and Prior Terms.

73. On May 5, 2026, Labaton informed EarnIn that it had procured an additional 2,301 individuals as purported clients alleging the same claims against EarnIn for a total of 35,096

[5] On information and belief, some Mass Arbitration Claimants are deceased, yet Labaton is still pursuing claims on their behalf.

individuals within the Labaton Claimant Pool.

74. Despite EarnIn providing Labaton an explicit warning that filing in AAA would be in contravention of the Current Terms and that Labaton must therefore engage in an individual analysis to determine whether each individual within the Labaton Claimant Pool was subject to the Current Terms or a version of the Prior Terms prior to filing arbitration demands on their behalf, on June 17, 2026, Labaton initiated arbitrations in AAA on behalf of 5,211 Mass Arbitration Claimants, including Defendants.

75. On July 27, 2026, AAA invoiced EarnIn for its portion of AAA's "Initiation Fee" and stated that EarnIn's payment was due within thirty (30) days.

76. On August 3, 2026, Labaton initiated arbitrations in AAA on behalf of an additional 4,315 Mass Arbitration Claimants.

**F. A Court Must Resolve the Parties' Dispute as to Whether Defendants Are Subject to the Current Terms or a Previous Version of EarnIn's Terms of Service.**

77. The Supreme Court recently reasoned that a dispute about whether an earlier arbitration agreement or a subsequent agreement applies to a claimant's claim must be decided by a court and not by an arbitrator. *See Coinbase, Inc. v. Suski*, 602 U.S. 143, 152 (2024).

78. Here, the parties dispute whether Defendants are subject to the Current Terms or a version of the Prior Terms, including which arbitral forum has jurisdiction over any disputes between Defendants and EarnIn.

## FIRST CAUSE OF ACTION

## DECLARATORY JUDGMENT STATING THAT THE CURRENT TERMS ARE VALID AND ENFORCEABLE AND BIND EACH INDIVIDUAL DEFENDANT

79. EarnIn incorporates by reference all of the above paragraphs, as if set forth fully herein.

80. Each Defendant has received notice of the Current Terms.

81. Each Defendant has assented to the Current Terms, including by performing a Cash Out transaction after September 15, 2025.

82. Each Defendant is therefore bound by the Current Terms and is required to comply with them, including the arbitration agreement.

83. Each Defendant is required to file any arbitration demand against EarnIn with NAM.

84. An actual, live controversy exists between EarnIn and Defendants regarding the Defendants' duties and performance under the Current Terms, including their filing arbitrations with AAA instead of NAM.

85. EarnIn seeks a declaration pursuant to 28 U.S.C. § 2201 that the Current Terms are valid and enforceable as to each Defendant, that each Defendant is bound by the Current Terms, and that each Defendant must pursue their claims in individual arbitration with NAM.

## PRAYER FOR RELIEF

WHEREFORE, EarnIn respectfully requests that the Court award the following relief:

(a) a declaration pursuant to 28 U.S.C. § 2201 that the Current Terms are valid and enforceable;

(b) a declaration pursuant to 28 U.S.C. § 2201 that the Current Terms govern the relationship between EarnIn and Defendants;

(c) a declaration pursuant to 28 U.S.C. § 2201 that each Defendant must pursue their claims in individual arbitration with NAM;

(d) an award of EarnIn's expenses and costs of suit, including attorneys' fees; and

(e) such other and further relief as the Court deems just and proper.

DATED: August 24, 2026

**McGuireWoods LLP**

By: *__/s/ Jeffrey J. Chapman__*

Jeffrey J. Chapman
Alicia A. Baiardo (*pro hac vice forthcoming*)
Aaron R. Marienthal (*pro hac vice forthcoming*)
Amy Morrisey Turk (*pro hac vice forthcoming*)
Paul M. Chappell (*pro hac vice forthcoming*)

*Attorneys for Plaintiff Activehours, Inc.*